Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL, JUDGE

SILICON STORAGE TECHNOLOGY, )
INC.,                        )
                             )
            Plaintiff,       )
                             )
     v.                      )   NO. C 10-01515 MHP
                             )
INTERSIL CORPORATION, et al., )
                             )
            Defendants.      )
-----------------------------)
and related counterclaim.    )
_____)
                                    San Francisco, California
                                    Monday, May 9, 2011

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:


For Plaintiff:          Covington & Burling LLP
                        9191 Towne Center Drive, 6th floor
                        San Diego, California  92122-1225
                   BY:  **ALAN H. BLANKENHEIMER**
                        **JO DALE CAROTHERS, Ph.D.**
                        **CHRIS J. LONGMAN**


For Defendants:         Shore, Chan, Bragalone, DePumpo, LLP
(Xicor, Inc., et al.)   Bank of America Plaza
                        901 Main Street, Suite 3300
                        Dallas, Texas  75202
                   BY:  **JEFFREY R. BRAGALONE**
                        **DOLLY WU, Ph.D., J.D.**


Reported By:       Leo T. Mankiewicz, CSR 5297 RMR, CRR

Monday, May 9, 2011

                    P R O C E E D I N G S

                                                   3:35 p.m.

        **THE CLERK:**  Calling civil 10-1515, Silicon Storage

Technology versus Intersil Company.

        **THE COURT:**  Good afternoon.  Could I have your

appearances, please?

        **MR. BLANKENHEIMER:**  Good afternoon, your Honor.

Alan Blankenheimer for the plaintiff SST, and with me at

counsel table are Jo Dale Carothers and Chris Longman.

        **THE COURT:**  Good afternoon.

        **MR. BRAGALONE:**  Good afternoon, your Honor.  Jeff

Bragalone of Shore, Chan, Bragalone, DePumpo, representing the

defendant Xicor.  With me also at counsel table is Dolly Wu of

our firm.

        **THE COURT:**  Good afternoon.  Sorry to keep you

waiting, but I had a phone call from one of my colleagues; so

unfortunately, sometimes it's the only way to do it, so I'm

keeping you waiting, I apologize.

        Okay, so you didn't like that judgment, huh?

        You liked it, I guess.

        **MR. BLANKENHEIMER:**  We did like it, your Honor, yes.

        **THE COURT:**  Well, I'm curious, because when you

filed your amended answer and counterclaim, maybe you were

hedging your bets, but you alleged infringement of, I recall

the wording, "at least Claims 12 and 13."  I guess that didn't eliminate the other claims.  But is there any reason why did you that as opposed to saying, you know, Claims 1 and -- what's the other dependent claim, or independent claim, 4, and Claims 12 and 13, or something like that?  I mean, were you really considering at that time that Claims 1 through 11 were infringed?

MR. BRAGALONE:  We were considering it, your Honor, but only as a result of some discovery that we would receive from the plaintiff in this case.  At the time that we came before you, your Honor, and actually suggested that the Court undertake the issue of the recapture as to Claims 12 and 13, we did not know of this additional use.  We discovered that only as a result of going through the documents that were produced in discovery, and as of now, we, of course, still don't have complete information on that, but there is a legitimate basis, your Honor, for assertion of the other claims, that is, claims other than 12 and 13.

THE COURT:  Well, the only difference between, say, 1 and 4 -- excuse me -- 1 and 12, excuse me, and 4 and 13 is reference to the use of -- you're going to love this one, Leo -- tetra -- tetraethylorthosilicate, something like that?

MR. BRAGALONE:  Yes, your Honor, that's right, -ethylorthoilicate.

THE COURT:  And hyphenated in the middle of the line

doesn't help, either.  Oh, here's one where it's written out all the way across the line.

In any event, that's the only difference, right?

**MR. BRAGALONE:**  That's the primary difference, your Honor, yes, and --

**THE COURT:**  Well, that's exactly the only difference in the language, other than, there are some dependent claims that have other, you know --

**MR. BRAGALONE:**  And your Honor, clearly --

**THE COURT:**  -- permutations and so forth.

**MR. BRAGALONE:**  -- from what we've seen so far in the discovery, the use of TEOS, if I may use the shorthand --

**THE COURT:**  May I use that, too?

**MR. BRAGALONE:**  That's what we like, your Honor, instead of having to say tetraethylorthosilicate.

**THE COURT:**  Let the record reflect he had to get assistance from his co-counsel on that one.

**MR. BRAGALONE:**  Yes, I did, your Honor.

And with respect to what we believe is SST's use of TEOS, it is much more limited and not as prevalent as the use of processes that don't involve TEOS.

**THE COURT:**  Well, sure.  It would be -- it's a limitation.

**MR. BRAGALONE:**  Yes, your Honor.

**THE COURT:**  No question about that.

**MR. BRAGALONE:**  But without the limitation, we believe that Claims 12 and 13 captured many more devices, whereas with the limitation, we were actually surprised to find some discovery that indicated that there was a process in place that did employ TEOS.

Now, the full ramifications of that we don't yet know, but we believe we do have a legitimate basis to go forward, and we don't want to abandon those claims solely to be expedient and take an appeal.

**THE COURT:**  Is there any way of taking an appeal without abandoning them?

**MR. BRAGALONE:**  Yes, your Honor, we believe so. First of all, we made a proposal to dismiss our claims on -- as to the other claims, to dismiss those without prejudice, and enter into a tolling agreement that would last through the appeal.  But for whatever reason, SST was not willing to do that voluntarily.

The second option -- and I wanted to come to the Court with some options, here.  So option number two is the procedure for certification of issues.  Even in a case where the issues are not completely dispositive of all issues, the Court, of course, can certify issues, and if the Court proceeds to vacate the judgment, we are prepared to file, virtually immediately, a motion requesting the certification.

And then the final opportunity is that Greenliant, a

different party, who purchased some assets and acquired some of the prior business of SST, they also filed a declaratory judgment action, as the Court may or may not recall.  That filing followed sometime after SST's filing.

In order to expedite matters, we suggested to Greenliant that they stipulate and the parties would both stipulate to be bound in that case by whatever your Honor's decision was in this case.

And in fact, I'm pleased to report that the parties, in fact, made that agreement.  So your judgment applies equally in the *Greenliant* case, but in the *Greenliant* case there are no counterclaims that have been asserted by my client.  So we believe in that case it, in fact, does result, we believe, in a final judgment.

And to the extent that there's any apprehension of possible action on other claims, we have -- I have been visiting personally with counsel for Greenliant and we've made a suggestion to them that if they provide us some initial information, we could even provide them with a covenant not to sue on the remaining claims, which would allow that judgment to become immediately final.

So the Court -- the third option, in short, is the Court could also stay further proceedings in this case pending the immediate appeal of the Greenliant issue, which is exactly the same judgment.

THE COURT:  Let me ask you this:  What would be the most economical way to handle this, both in terms of the parties spending their money on further discovery and attorneys' fees and so forth, and as far as the Court is concerned?

MR. BLANKENHEIMER:  Your Honor, we believe that, if I may address --

THE COURT:  Could you hold on one second, please?

MR. BLANKENHEIMER:  Certainly.

(The Court confers with the Clerk, *sotto voce*.)

MR. BLANKENHEIMER:  Would you like me to address your Honor's questions?

THE COURT:  Yes, please.

MR. BLANKENHEIMER:  And I will move, if that's okay.

THE COURT:  That's fine.

MR. BLANKENHEIMER:  First of all, the issue of the other claims -- and your Honor was correct.  I think counsel misspoke.  He said that the primary difference between 1 and 4 and 12 and 13 was TEOS, was the elimination of the TEOS limitation in 12 and 13.  That's the entire difference.  I mean, you can track word for word those claims.  The only difference is TEOS, in Claims 1 and 4.

In our view -- and your Honor will recall that in an effort to be expeditious and efficient, we suspended the Patent Local Rules earlier, and so they still have not kicked in.  We

have been seeking for a couple of months information from opposing counsel about what claims other than 12 and 13 they think they're asserting, what basis there is for those claims, what products they're accusing, and then we can make an assessment, but so far, they've refused, on every occasion we've requested, to give us that information.

We therefore think that the most efficient way to proceed is to require the Patent Local Rules schedule to kick in. That will tell us the lay of the land. That will tell us what claims, 1 through 11, are at issue, what products, and if there's a basis. If there's no basis, we can take appropriate steps to advise them of that; if necessary, take limited discovery; if necessary, file a motion for summary judgment.

That we think that the reason -- the Federal Circuit, as your Honor is well aware, like other appellate courts, discourages piecemeal appeals, and the approach suggested by Xicor would require two different appeals. We don't think that's the most efficient way to proceed.

We would suggest that the Patent Local Rules take immediate effect, as suggested in our schedule, and that we proceed from there.

THE COURT: Well, it sounds as if defendants -- and you can step up here, so we can have a conversation about this -- but the defendants are contending that they can't say which -- what infringes these claims, and because they don't

have discovery as to what apparatuses, or apparati, or devices, or whatever are infringing.

MR. BLANKENHEIMER:  I think, your Honor, we've produced 240,000 documents in this case, and they have ample opportunity to read those documents, and I think what you heard is, they believe they do have a basis to assert claims other --

THE COURT:  You believe you have a basis based on what you've seen, so that you could file invalidity contentions, or -- not invalidity, but infringement contentions, and If not, why not?

MR. BRAGALONE:  First of all, your Honor, let me answer the second question first, to answer the first question.

We received discovery, but that was related to the assertion of Claims 12 and 13 and against certain products.  No question we received a lot of discovery relating to that.  We found some incidental documents that indicated the use of TEOS, but that was never -- that was never the subject of any of our discovery that we exchanged.  So we don't know what else is there.  Your Honor is absolutely correct.  All we have seen is a little tip of the iceberg.

Now, can we make an allegation as to the tip of that iceberg?  Yes, but in terms of providing complete allegations, for all devices?  No, we certainly aren't ready.

THE COURT:  Can you do infringement contentions based on what you have?

**MR. BRAGALONE:**  I think that would be very difficult, your Honor, and I'm certain that that would only lead to satellite litigation and challenges of the sufficiency of our disclosures, because the information we have, as I said, is only the tip of the iceberg, because none of the discovery requests were directed to the other claims, or the use of TEOS.

And may I just mention one thing, your Honor?  You asked counsel what would be most efficient in terms of cost savings, savings of attorneys' fees.  We think that's exactly how the Court should look at this, and one of the issues the Court should focus on.  Certainly proceeding with a full-blown trial on only part of the claims while the other claims are adjudicated in a summary fashion isn't the most efficient way.

We agree that we shouldn't do this piecemeal, but if the Court's going to have a *Markman* hearing, it is certainly not going to have a *Markman* hearing on an assertion of claims where the Court has already granted summary judgment on what, I think we would agree, is certainly the vast majority of the case, in terms of scope.

**MR. BLANKENHEIMER:**  Your Honor, if I may say, I respectfully disagree with opposing counsel.  We haven't produced the tip of an iceberg, we've produced the iceberg. We've produced all our process flows.  We didn't withhold any document because it contained TEOS or it didn't contain TEOS. They had extremely broad discovery, and we complied with that.

LEO T. MANKIEWICZ, CSR, RMR, CRR          Pro Tem Reporter - U.S. District Court

We produced, I suspect it's over a million pages of documents, but it is every process flow in the company, so far as I'm aware, in terms of products that we've sold.

And so they have ample opportunity.  The only -- it would be appropriate now, I think, to basically -- they want to try to steal second base with their foot on first.  It would be appropriate now to have them tell us, under the rigor and formality of Patent Local Rule 3-1, to tell us what they think they have, and then we can proceed from there.  It may be that we can resolve this quickly, if it truly is something that we think they're mistaken about.  It may be a real issue.  It may be a significant issue.  We don't know.

What they have said in their papers, in the Joint Case Management Statement, is that giving up these claims would be a windfall to us, and if they're really asserting a windfall, they must be suggesting there's something really significant there.  Well, if there's something significant there, it's perfectly appropriate to proceed, under the local rules and under the procedures of this court, to adjudicate those claims.  We won't know, because they won't tell us.

**THE COURT:**  Now, let me get some clarification.  Are you interpreting Claim 1 as a method claim and Claim 4 as a device claim, or apparatus claim?  Do you know?  I mean, the patent itself refers to an apparatus and method, et cetera, but what is claimed in Claim 1 is "an improved tunneling region for

use with," and then it goes about how to establish that.  But, you know, a tunneling region is not a device, right?  It's how you create a tunneling region, right?

MR. BRAGALONE:  Your Honor, I think it may very well qualify as a device.  It certainly, in the context of the claims that are product by process claims, that involves the creation of a product through a certain process, where, you know, you are allowed to attribute novelty --

THE COURT:  Is that what this claim is, then, in your interpretation?

MR. BRAGALONE:  Yes, your Honor.

THE COURT:  And then Claim 4 I would assume is the same thing.

MR. BRAGALONE:  It is, your Honor.

THE COURT:  Is that correct?  Okay.  Now, does plaintiff have any devices that use TEOS in this manner described in the patent?

MR. BLANKENHEIMER:  We're not aware of any, your Honor, and that's why we have asked them to tell us the basis for their belief.  But it's partly because we don't know how they're construing the claim, and that's precisely the rigor that Patent Local Rule 3-1 requires.  It will require us -- it will require them to tell us how they view the claim, how they believe it reads on our devices, and the --

THE COURT:  Well, but did you have before you, when

you tagged Claims 12 and 13, did you have in mind particular devices that you believe they were claiming infringed Claims 12 and 13?

MR. BLANKENHEIMER:  We filed our summary judgment motion based on the representation of Xicor's counsel that your Honor may remember, that the issue of improper recapture would be dispositive of the case.

Now, he made that representation in open court, based on the facts as he then understood it.  What we're now hearing is a different version.  Since the summary judgment ruling, we're now hearing that there may be other claims, and if there are, and if they've found those in the documents, have them tell us what their basis is and we can proceed from there.

THE COURT:  Well, I don't think that still answers the question.

MR. BRAGALONE:  Your Honor, may I answer the question?  Yes, they did.  We provided them multiple pages that listed the specific devices that we were accusing of infringing Claims 12 and 13.  But that was after we received discovery relating to Claims 12 and 13.  So I'm -- that, I think, was the answer to your question.

THE COURT:  Now, are there other devices that, in fact, you claim are in addition to what they disclosed that use TEOS?  Is that the difference?

MR. BRAGALONE:  Partly, your Honor, but if I could

explain briefly, of course, Claims 12 and 13 remove the TEOS limitation.

THE COURT:  I know, yes.

MR. BRAGALONE:  So a device that infringes 12 and 13 that uses TEOS gas, it still infringed 12 and 13 even if it did use TEOS, because --

THE COURT:  Well, that's true, but also, it would have to be essentially the same types of device that meet all of the other elements of the claim and the limitations in the claim, except that -- and they're exactly the same.  They read exactly the same, other than in the dependent claims there's some things, but they read exactly the same, except for that they use -- with Claim 1 and Claim 4, they use TEOS.

MR. BRAGALONE:  And I'm not trying to suggest that there aren't other claim construction issues that the Court will have to take up at a *Markman* hearing.  I think counsel alluded to the fact they believe that there are still other claim construction issues.

The goal behind 12 and 13 was to cover the issue of recapture, and whether or not it was appropriate under the rule against recapture to have reissued claims that removed that TEOS limitation.

THE COURT:  But that was the only thing that was being removed, right?

MR. BRAGALONE:  Exactly, and the discovery that we

received did not focus in any way on which devices use TEOS. That would be a very simple thing to ask, which devices use this TEOS process.

THE COURT:  Well, then, why don't you do that?

MR. BRAGALONE:  Well, because, your Honor, then we would have the tail wagging the dog.  The whole purpose of presenting Claims 12 and 13 is that covered the vast majority of the SST products, and if we --

THE COURT:  But it's not going to cover the vast majority unless they use TEOS, right?

MR. BRAGALONE:  That's absolutely right.

THE COURT:  Okay.

MR. BRAGALONE:  And so what the Court would be faced with, and what we were trying to avoid, is to have one *Markman* hearing that construes everything but 12 and 13, and then after the conclusion of that, let's say it goes all the way to trial or some disposition.  Then at that point, it would be ripe for appeal.  So you're appealing not only the initial *Markman*, but also Claims 12 and 13 on the recapture, which haven't had a *Markman*, and if there is any --

THE COURT:  But why would the term that you fixed upon as being in dispute in Claims 1 and 4 be any different from what are in Claims 12 and 13?

MR. BLANKENHEIMER:  They're not, your Honor. They're not.  There won't be any dispute about the meaning of

TEOS, and that's the only difference between those two sets of claims.

MR. BRAGALONE:  Your Honor, with respect to that *Markman* issue, the meaning of TEOS, I'm not sure there's any difference today on that issue, but we don't know what other claim construction issues they would raise, and it may, in fact, vary based upon the devices and their strategy for defending those, but --

THE COURT:  Well, first of all, you have received some discovery -- they say it's all discovery -- with respect to any devices that may at all be related to claims 12 and 13.

MR. BLANKENHEIMER:  Let me correct that.  So far as I am aware, I'm not aware of -- they asked for our process flows.  They didn't ask for our process flows without TEOS.  They asked for our process flows.  We produced our process flows.

THE COURT:  Do all of those include TEOS?  I mean -- strike that.  Do some of those include TEOS?

MR. BLANKENHEIMER:  We do not believe that they do, but we don't know how they are construing that term.  We don't know, for example, if they're assuming infringement under the doctrine of equivalents.  We don't know what the basis of their assertion is, but obviously, they've seen something in those process flows that makes them think that Claims 1 through 11 can be asserted.  We're asking what it is.

THE COURT:   What is it?   Have you seen ones that use TEOS?

MR. BRAGALONE:   Your Honor, we've seen documents that have that word in it, for example, tetraethyl- --

THE COURT:   TEOS.

MR. BRAGALONE:   TEOS, thank you.

THE COURT:   You're permitted to use it now.

MR. BRAGALONE:   So yes, a few of their documents actually reveal that, but I want to be clear, we did not obtain all the process flows.   Ms. Wu has advised me just now that we don't have process flows, for example, from -- all of the process flows from their main foundry, TSMC, but the point is that we didn't need all of that to present the recapture issue to the Court.

Now, instead of trying to streamline this and to save expenses, which is what we are asking the Court to help us with here, they want to move on and litigate the tail, instead of dealing with the dog.

THE COURT:   Well, sometimes, some analogies are not always apt.   What I want you to do is I want you to propound whatever discovery, in the forms of interrogatories and document requests, you believe are necessary to find out what else they have that would show any infringement of Claims 1 through 11.   Okay?   And if, in fact, they have turned over everything that they think is responsive, you may not get much

of anything.  I don't know.

But let's set a limited period of time by which, you know, that will be done and the discovery will be provided; and then a date for you to file your infringement contentions under the Local Rules, and we still don't have to abide by all those Local Rules in excruciating detail.  Sometimes, you know, one can short-circuit them where it's appropriate to do it, but to have you -- we know that -- which of the claims, are you going to be claiming both 1 and 4 are infringed?  Are you going to be claiming that some or all of the dependent claims are infringed, or which ones?

So set those forth, and then set forth, based upon the discovery you have, your infringement contentions, and what devices you claim are, in fact, infringing.

And then I think after one has those, it would be a good idea to have a status conference and see where we go from there.  I mean, you can talk informally about, really, are there terms in dispute that would need claim construction, or where do we go?

And that would give us some sens of how much of an expedition this is going to be, or would it really be worthwhile to just get it up to the Circuit.

**MR. BRAGALONE:**  Very good, your Honor, and that would also -- your suggestion also would allow time for the Greenliant issue to mature.

THE COURT:  So how long would it take for you to get your interrogatories, requests for production, done in order to get the information you need?

MR. BRAGALONE:  May I confer with my attorney?

THE COURT:  Yes.  This is the brains behind the operation.  Sorry about that.

MR. BRAGALONE:  I'm very used to that, your Honor.

MR. BLANKENHEIMER:  I was taking the opportunity to confer with my counsel, as well, your Honor, but --

THE COURT:  You brought one more brain than they did.

MR. BLANKENHEIMER:  We did.  We didn't have as far to travel, perhaps.  I'll wait till counsel comes back to the bench.

THE COURT:  Well, one of the things you can be thinking about is, you sort of have an idea of what it is that's going to be sought, and how long will it take to respond.  I'm talking to the one brain that's listening.

MR. LONGMAN:  I'm listening, your Honor.

MS. CAROTHERS:  That's why we need another person.

MR. BLANKENHEIMER:  One of our brains was listening. My judge used to say, when I was clerking, what my judge used to say, when his law clerks marched in, he'd say, "I want you to meet my brains."

THE COURT:  Well, that's it.  Now you know.  That's

absolutely true.

MR. BLANKENHEIMER:  Now you're making him blush, your Honor.

(Pause in proceedings.)

THE COURT:  Yes.

MR. BRAGALONE:  Yes, your Honor, thank you for permitting me to learn more.

My understanding is that there are a couple of issues involved.  One is that several of the foundries are foreign entities, and as such, they have been very unwilling to produce process flows.  SST did provide us some process flows, but -- from these foundries, but by far, the majority of them we did not obtain.

Perhaps with SST's assistance, we could facilitate that discovery and get those process flows, but that is really number one --

THE COURT:  These are foundries that contract with SST --

MR. BRAGALONE:  Yes, your Honor.

THE COURT:  -- to provide the devices?

MR. BLANKENHEIMER:  That's correct, your Honor.

THE COURT:  And the devices are what, they're semiconductor devices?

MR. BLANKENHEIMER:  They're all flash memory.

THE COURT:  They're all flash memory, okay.

**MR. BRAGALONE:**  So perhaps with some -- and realize, your Honor, the parties did cooperate previously.  However, we all understood that the focus was Claims 12 and 13, and we really weren't focused on TEOS and whether TEOS was used, but --

**THE COURT:**  Well, it would be their responsibility to get that discovery from companies that are manufacturing the devices, correct?

**MR. BRAGALONE:**  The SST --

**MR. BLANKENHEIMER:**  Yes, your Honor, we sought in the first instance to do precisely that.  Obviously, these are --

**THE COURT:**  Where are those foundries?

**MR. BLANKENHEIMER:**  Well, they are -- at least -- the main foundry is in Taiwan, and -- but there are, I believe, others.  I don't know that I could tell you at the moment all of them, but we did request the information, the process flows, from each of those foundries.  So far as I am aware, we produced a representative of every process flow that we have created at SST, but there are documents that belong to these foundries.  They have produced -- I was going to say the bulk of them, but I obviously can't say that, but they have produced many such documents.

**THE COURT:**  How long will it take for you to get what you may need to respond?  You'll have to see what their

requests are actually for.

MR. BLANKENHEIMER:  Absolutely, your Honor.  I don't -- because we're dealing with third parties, I mean, these are obviously parties with which we contract, but they are third parties, and they have their own interests in preserving confidentiality of documents and of not producing documents unnecessarily.  And so we will do our best to, as we have done previously, to have our foundries cooperate with the discovery requests.

THE COURT:  Well, and you can certainly, if you have not already, work out a protective order, and fold them into it.

MR. BLANKENHEIMER:  We have done so, your Honor. That should not be an impediment.

THE COURT:  And I would assume that Silicon Storage is a big customer, right?

MR. BLANKENHEIMER:  There are many bigger, but it is --

THE COURT:  But you have some bargaining power.

MR. BLANKENHEIMER:  We should, your Honor.  What I was going to --

THE COURT:  So your client will use that bargaining power.

MR. BLANKENHEIMER:  We will do our best, your Honor. I would request that, so that the discovery isn't totally

one-sided, that we be permitted to propound a limited set of counterpart interrogatories.  I don't know that we will have any requests for production, but a limited set of interrogatories, at the very least, during this interim period.

THE COURT:  Well, would that make more sense after you got the infringement contentions, so that you have something to aim at, because they may look through these and come up with, you know, some conclusions about certain processes that, really, they're not going to argue about or not going to put in contention and others that they will, and you might guess wrong.

Why not let them get the discovery with the understanding that within a certain period of time after they provide you the infringement contentions, you can propound your discovery to get at some of that and get answers, and then have a status conference.

MR. BLANKENHEIMER:  That would be acceptable, your Honor.

THE COURT:  Would that work out?

MR. BLANKENHEIMER:  Provided we get a Patent Local Rule 3-1 statement at the -- if they wish to pursue any of these claims.

THE COURT:  Well, yes.  I mean, what you would get is, you know, what you'd get under the disclosure of the claims being asserted, and then the infringement contentions that flow

therefrom, right?

MR. BLANKENHEIMER:  Yes.

THE COURT:  That's what you're talking about, right?

MR. BLANKENHEIMER:  Yes, your Honor.

THE COURT:  Right, right.  So how long do you think it would take for you to propound the discovery that you need by way of either request for production, no depos, but request for production and request for interrogatories?

MR. BRAGALONE:  Yes, your Honor.  Certainly within 10 days, if not sooner, we can get all of any formal discovery directed to the TEOS limitation to SST.  I think, as Mr. Blankenheimer indicated, the big issue is going to be how long it takes to get information from the third party foundries in terms of when we can process it, but within --

THE COURT:  Sixty days?

MR. BRAGALONE:  -- your Honor, within a short --

THE COURT:  How long did it take before?

MR. BLANKENHEIMER:  It would be a rough estimate.  I believe that would be about right.  It was 60, at the most 90, but --

MR. BRAGALONE:  It was about 90 days before we got some responses from the foundries.  Now, some foundries apparently produced all documentation.  We know that TSMC did not produce a large amount.  We also have two other foundries, but to my knowledge only two others, that didn't produce

information to us.

So assuming SST applies some friendly persuasion and we can get the documents promptly, I think we can easily shoot for 90 days to receive the documents, if --

THE COURT:  Ninety days from your ten-day service of --

MR. BRAGALONE:  Yes, your Honor.

THE COURT:  Ten days would take us out to the 18th of May?

MR. BLANKENHEIMER:  That sounds about right.

THE COURT:  And the 90 days from -- thereafter, and then -- and how long thereafter -- I like to give dates, just so -- some people count 90 days more easily than other people.

So 90 days would take it out to where, Mr. Bowser?

THE CLERK:  August 18th.

THE COURT:  August 18th?  How long to prepare your statement of asserted claims and your contention interrogatories -- your contention -- infringement contentions?

MR. BRAGALONE:  Your Honor, I would say within two weeks of receipt.  We are hopeful we'll receive the documentation long before that 90-day period expires, but that certainly gives us enough time to put it within that window.

THE COURT:  Okay.

MR. BRAGALONE:  And then I would say a couple weeks, at most.

THE COURT:   So two weeks thereafter would be August what?

THE CLERK:   September 1st.

THE COURT:   September 1st, and then a status conference or case management conference approximately three weeks thereafter, so that one week before that you will -- you can meet and confer, and then one week before that file a joint case management conference statement as to how you intend to proceed:   Is there some there there, how much there is there --

MR. BLANKENHEIMER:   Exactly.

THE COURT:   -- and what, in fact, what claims are really going to be contended as being infringed, and what are the infringing -- whatever you're calling it, processes or devices, and that kind of information; and then what is the next stage, and does it make sense to then to continue to proceed on that path or would it be better at that point to seek an appeal.

In the meantime, I guess what I should do is vacate the judgment, subject to it being reentered, if appropriate.

MR. BRAGALONE:   Your Honor, and may I ask, in follow-up to your point of how much there is there, and whether it's worth it, in fact, I would also like the ability to serve very limited and focused financial discovery, but only with respect to the number of devices produced and that sort of thing, because in addition to the fact of infringement, when

we're making the decision, when I'm advising my client as to whether the juice is worth the squeeze, it will be helpful to know how much --

THE COURT:  You can ask them in informal discussions, but I'm not going to allow any additional discovery until we have a case management conference.

MR. BRAGALONE:  Okay.

THE COURT:  Okay?  If you can have informal discussions about it --

MR. BRAGALONE:  Perhaps informal would help.  I imagine Mr. Blankenheimer will be very happy to share with me details of *de minimus* products, if that's the case.

MR. BLANKENHEIMER:  Your Honor, we think they already have that information, but we'll have that -- we'll certainly be willing to --

THE COURT:  That's something we can take up at the case management conference.

MR. BRAGALONE:  Very good.

MR. BLANKENHEIMER:  May I raise one final item?

THE COURT:  Yes.

MR. BLANKENHEIMER:  Counsel alluded to a related case, which is the --

THE COURT:  *Greenliant*.

MR. BLANKENHEIMER:  -- *Greenliant* case, and I confess I don't know -- obviously, I was not privy to

Mr. Bragalone's conference with Greenliant counsel.  What I would request is, if there is some agreement reached in that matter, that we be permitted the opportunity to intervene to protect our rights on appeal should that come about.

THE COURT:  Well, I guess you -- you know, you're asking for advance permission.

MR. BLANKENHEIMER:  I am not.  I'm merely advising -- let me put it differently.  I'm advising the Court that we may move to intervene in that event.

THE COURT:  Well, and at least you should -- you would have the courtesy to advise opposing counsel in this case that you have reached an agreement, and while he doesn't need to know all the details, but let him know those that may impact in this case.

MR. BLANKENHEIMER:  That would be sufficient, your Honor.

MR. BRAGALONE:  Absolutely, your Honor.

THE COURT:  And they can figure out what to do.

MR. BRAGALONE:  Happy to do that.

THE COURT:  Taking it out, Tony, the other dates would take them out to where?

THE CLERK:  September 26th, at 3:00 o'clock.

THE COURT:  Now, all of this is a bit of -- not for you, it's not a fiction, but for me it is, because I'm not going to be here.  I'm retiring, and so somebody else will have

the pleasure.  The cases, I think, were related.  I assume they were, otherwise I would not -- it would have really been a strange luck of the draw.

**MR. BRAGALONE:**  I think they were related, your Honor, that's correct.

**THE COURT:**  So that whoever it's been reassigned to would get both of them, if it's done right.  Generally it is, and I don't know, you know, who's going to get them, but I thought this should not wait.  You need to move forward.

But then, with the understanding of how we were proceeding so far, this is -- the judgment is vacated subject to being reentered at an appropriate time as determined after the next status conference or sometime thereafter.

**MR. BLANKENHEIMER:**  Understood, your Honor.  Thank you very much.

**THE COURT:**  Okay?

**MR. BRAGALONE:**  Thank you, your Honor.

**THE COURT:**  Okay.  Well, good luck.

**MR. BLANKENHEIMER:**  And good luck to your Honor, as well.

**THE COURT:**  Thank you, thank you.

**MR. BRAGALONE:**  Yes, in the event, perhaps pleasant for you but not necessarily for us, that we don't see you before the event.

**THE COURT:**  Well, thank you.  Just wish me good luck

in packing.  Thirty years of accumulated papers is daunting.  So you can march on now.

**MR. BLANKENHEIMER:**  We will.  We will.  Thank you, your Honor.

**THE COURT:**  Thank you.

**THE CLERK:**  Court is in recess.

4:19 p.m.

### CERTIFICATE OF REPORTER

I, LEO T. MANKIEWICZ, a pro tem reporter in the United States Court, Northern District of California, and Certified Shorthand Reporter duly licensed in the State of California, hereby certify that the foregoing proceedings in Case No. C 10-01515 MHP, Silicon Storage Technology, Inc. v. Intersil Corporation, et al., were reported by me, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Thursday, May 12, 2011

LEO T. MANKIEWICZ, CSR, RMR, CRR          Pro Tem Reporter - U.S. District Court